NO. 08-3678 EMSL

*Criminal*

IN THE

# UNITED STATES COURT OF APPEALS

## FOR THE EIGHTH CIRCUIT

# *UNITED STATES OF AMERICA*

*Appellee*

*v.*

# *BURL WASHINGTON*

*Appellant*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION*

**BRIEF OF APPELLEE**

## **MICHAEL W. REAP**
**Acting United States Attorney**

Tiffany G. Becker
*Assistant United States Attorney*
*111 S. 10th Street, Rm 20.333*
*St. Louis, Missouri 63102*

*Attorneys for Appellee*

## <u>SUMMARY OF THE CASE AND POSITION ON ORAL ARGUMENT</u>

Appellant/defendant Burl Washington ("Washington") was charged with distribution of fentanyl with death resulting (Count I), distribution of oxycodone with death resulting (Count II), distribution of fentanyl (Count III) and possession with intent to distribute fentanyl (Count IV). After being represented by two different attorneys at various stages of the case, and following voir dire, defendant invoked his right to self-representation. Trial proceeded before the Honorable Catherine D. Perry. During the trial, the Government presented both direct and circumstantial evidence of Washington's guilt, and the jury convicted Washington of all counts.

At sentencing, after a litany of pro se motions as well as two notices of interlocutory appeal, Judge Perry granted Washington's request for the appointment of standby counsel. The sentencing hearing was continued and thereafter, the district court appointed Attorney Daniel Juengel as stand by counsel and ordered the sentencing hearing to occur on November 7, 2008.

After a full hearing during which Washington received the benefit of standby counsel as well as representation of standby counsel on his behalf, Judge Perry sentenced defendant Washington to 360 months on each of Counts I and II and 240 months on Counts III and IV, all such terms to be served concurrently.

Washington's standby counsel timely filed a notice of appeal on November 17, 2008.

The Government does not believe that oral argument is necessary in this case. The issues raised in appellant's brief can be addressed by review of the record and application of existing law. Accordingly, oral argument will not significantly aid the court in deciding this case. However, should the Court grant appellant's request for oral argument, the Government respectfully requests an equal amount of time to respond.

# **TABLE OF CONTENTS**

SUMMARY AND STATEMENT CONCERNING ORAL ARGUMENT

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARGUMENT

      I.    DID THE DISTRICT COURT PROPERLY GRANT
           DEFENDANT WASHINGTON'S CLEAR AND
           UNEQUIVOCAL REQUEST TO REPRESENT HIMSELF AT
           TRIAL? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      II.   WAS THE EVIDENCE PRESENTED AT TRIAL
           SUFFICIENT TO SUPPORT THE JURY'S GUILTY
           VERDICTS? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      III.  DID THE DISTRICT COURT COMMIT PLAIN ERROR
           IN ALLOWING THE ADMISSION OF TESTIMONY
           REGARDING DEFENDANT WASHINGTON'S PRIOR
           CRIMINAL ACTIVITY? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      IV.  DID THE DISTRICT COURT ERR IN GIVING JURY
           INSTRUCTIONS 17 AND 18? . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Appellate Case: 08-3678    Page: 4    Date Filed: 06/26/2009 Entry ID: 3561263

# **TABLE OF CONTENTS**

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

ADDENDUM

CERTIFICATE OF SERVICE

Appellate Case: 08-3678     Page: 5     Date Filed: 06/26/2009 Entry ID: 3561263

# TABLE OF AUTHORITIES

FEDERAL CASES                                                        Page(s)

*Berry v. Lockhart*, 873 F.2d 1168 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . 29, 32, 33

*Farretta v. California*, 422 U.S. 806 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Ferguson v. Bruton*, 217 F.3d 983 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 33, 34

*Gilbert v. Lockhart*, 930 F.2d 1356 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 33

*Godinez v. Moran*, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 35

*Johnson v. Zerbst*, 304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Meyer v. Sargent*, 854 F.2d 1110 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 33

*Reese v. Nix*, 942 F.2d 1276 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Adams*, 401 F.3d 886 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 47

*United States v. Aldridge*, 561 F.3d 759 (8th Cir. 2009) . . . . . . . . . . . . . . . . 46, 56

*United States v. Atkinson*, 297 U.S. 157 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Bass*, 794 F.2d 1305 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Brown*, 422 F. 3d 689 (8th Cir. 2005 . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Campa-Fabela*, 210 F.3d 837 (8th Cir. 2000) . . . . . . . . . . . 55, 56

*United States v. Christian*, 861 F.2d 195 (8th Cir. 1989) . . . . . . . . . . . . . 25, 32, 35

Appellate Case: 08-3678    Page: 6    Date Filed: 06/26/2009 Entry ID: 3561263

FEDERAL CASES Page(s)

*United States v. Derring*, 592 F.2d 1003 (8th Cir. 1979) . . . . . . . . . . . . . . . . . . . 47

*United States v. Edelmann*, 458 F.3d 791 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . 34

*United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 36

*United States v. Garey*, 540 F.3d 1253 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . 28

*United States v. Green*, 151 F.3d 1111 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . 45, 55

*United States v. Harmon*, 194 F.3d 890 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . 37

*United States v. Harris*, 324 F.3d 602 (8th Cir. 2003) . . . . . . . . . . . . . . . . . 56-57

*United States v. Houston*, 406 F.3d 1121 (9th Cir. 2005) . . . . . . . . . . . . . . . 59, 60

*United States v. Johnson*, 439 F.3d 884 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . 53

*United States v. Johnson*, 439 F.3d 947 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . 54

*United States v. Johnson*, 463 F.3d 803 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . 46

*United States v. Jones*, 559 F.3d 831 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Katz*, 445 F.3d 1023 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Lee*, 356 F.3d 831 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Light*, 406 F.3d 995 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Maggard*, 156 F.3d 843 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . 45

*United States v. Mahasin*, 442 F.3d 687 (8th Cir. 2006) . . . . . . . . . . . . . . . . 22, 32

*United States v. McIntosh*, 236 F.3d 968 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . 58

Appellate Case: 08-3678 Page: 7 Date Filed: 06/26/2009 Entry ID: 3561263

FEDERAL CASES                                                    Page(s)

*United States v. Mentzos*, 462 F.3d 830 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 29

*United States v. Millard*, 139 F.3d 1200 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . 45

*United States v. Montanye*, 996 F.2d 190 (8th Cir. 1993) . . . . . . . . . . . . . . . 45, 46

*United States v. Moore*, 735 F.2d 289 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . 46

*United States v. Morris*, 327 F.3d 760 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 43

*United States v. Myers*, 503 F.3d 676 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Olano*, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Patterson*, 140 F.3d 767 (8th Cir. 1998) . . . . . . . . . . . . 22, 24, 31

*United States v. Patterson*, 38 F.3d 139 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . 59

*United States v. Perez-Tosta*, 36 F.3d 1552 (8th Cir. 1994) . . . . . . . . . . . . . . . . . 52

*United States v. Phythian*, 529 F.3d 807 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . 36

*United States v. Rebmann*, 226 F.3d 521 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . 58

*United States v. Robinson*, 167 F.3d 824 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . 58

*United States v. Rolett*, 151 F.3d 787 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Severe*, 29 F.3d 444 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Soler*, 275 F.3d 146 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Steele*, 550 F.3d 693 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 56

Appellate Case: 08-3678    Page: 8    Date Filed: 06/26/2009 Entry ID: 3561263

FEDERAL CASES                                                    Page(s)

*United States v. Stewart*, 20 F.3d 911 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Swinney*, 970 F.2d 494 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 33

*United States v. Swinton*, 75 F.3d 374 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Thomas*, 565 F.3d 438 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 37

*United States v. Thompson*, 560 F.3d 745 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . 43

*United States v. Veltman*, 9 F.3d 718 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Webster*, 84 F.3d 1056 (8th Cir. 1996) . . . . . . . . . . . . . . . . . 23, 33

*United States v. Yagow*, 953 F.2d 427 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 25

FEDERAL RULES                                                   Page(s)

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Fed. R. Crim. Proc. 51(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Crim. Proc. 52(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Appellate Case: 08-3678     Page: 9     Date Filed: 06/26/2009 Entry ID: 3561263

# STATEMENT OF THE ISSUES

**I.    DID THE DISTRICT COURT PROPERLY GRANT DEFENDANT WASHINGTON'S CLEAR AND UNEQUIVOCAL REQUEST TO REPRESENT HIMSELF AT TRIAL?**

*United States v. Light*, 406 F.3d 995 (8th Cir. 2005)
*United States v. Patterson*, 140 F.3d 767 (8th Cir. 1998)
*United States v. Christian*, 861 F.2d 195 (8th Cir. 1989)

**II.    WAS THE EVIDENCE PRESENTED AT TRIAL SUFFICIENT TO SUPPORT THE JURY'S GUILTY VERDICTS?**

*United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009)
*United States v. Jones*, 559 F.3d 831 (8th Cir. 2009)
*United States v. Thompson*, 560 F.3d 745 (8th Cir. 2009)

**III.    DID THE DISTRICT COURT COMMIT PLAIN ERROR IN ALLOWING THE ADMISSION OF TESTIMONY REGARDING DEFENDANT WASHINGTON'S PRIOR CRIMINAL ACTIVITY?**

*United States v. Moore*, 735 F.2d 289 (8th Cir. 1984)
*United States v. Johnson*, 463 F.3d 803 (8th Cir. 2006)
*United States v. Aldridge*, 561 F.3d 759 (8th Cir. 2009)

**IV.    DID THE DISTRICT COURT ERR IN GIVING JURY INSTRUCTIONS 17 AND 18?**

*United States v. McIntosh*, 236 F.3d 968 (8th Cir. 2001)
*United States v. Rebmann*, 226 F.3d 521 (6th Cir. 2000)
*United States v. Patterson*, 38 F.3d 139 (4th Cir. 1994)

Appellate Case: 08-3678    Page: 10    Date Filed: 06/26/2009 Entry ID: 3561263

## STATEMENT OF THE CASE

On December 20, 2007, Washington was indicted by a federal grand jury in the Eastern District of Missouri and charged with: knowingly distributing Fentanyl, a Schedule II controlled substance with the death of Justin Knox resulting (Count I); knowingly distributing Oxycodone, a Schedule II controlled substance with the death of Justin Knox resulting (Count II); knowingly distributing Fentanyl (Count III); and possession with intent to distribute Fentanyl (Count IV).

After being represented by two appointed, experienced criminal defense attorneys, Washington elected to exercise his right to self-representation and proceeded pro se after jury selection but before opening statement. On June 19, 2008, the jury returned verdicts of guilty on all four counts.

On November 7, 2008, the district court sentenced defendant Washington to 360 months on each of Counts I and II and 240 months on Counts III and IV, all such terms to be served concurrently.

Washington, through standby counsel, filed a timely notice of appeal and requests reversal of his conviction.

Appellate Case: 08-3678    Page: 11    Date Filed: 06/26/2009 Entry ID: 3561263

# STATEMENT OF FACTS

## *Facts Presented at Trial*

Early in the morning on March 11, 2006, law enforcement and emergency medical personnel were dispatched to 7381 Highway 32 in Ste. Genevieve County. TT Vol. I, 100, 103. Upon arrival, officials found Justin Knox dead. TT Vol. I, 103-04. Det. Sgt. Michael Stacy of the Ste. Genevieve County Sheriff's department, who also served as deputy coroner, responded to the scene. TT Vol. I, 113-14. Following the processing of the scene, Det. Stacy drove Knox's body to the Mineral Area Medical Center in order for an autopsy to be performed by Dr. Michael Zaricor. TT Vol. I, 116-17.

Det. Stacy investigated the circumstances behind the death of Justin Knox. TT Vol. I, 116. He spoke with John Lochirco. TT Vol. I, 116. John Lochirco testified that he illegally obtained and abused prescription drugs, specifically Fentanyl and Percocet. TT Vol. I, 143-44. Lochirco stated that he ingested Fentanyl in patch form and would suck on the patch. TT Vol. I, 143. Justin Knox was Lochirco's close friend and he also had a problem with abusing prescription medications. TT Vol. I, 144-45. The two of them ingested Fentanyl patches and Percocets together. TT Vol. I, 145.

1

Heather Deering was an old girlfriend of Lochirco's and she also abused the same drugs. TT Vol. I, 145. Deering introduced Lochirco to Burl Washington so that Lochirco could obtain drugs from Washington. TT Vol. I, 146. Lochirco eventually made his own connections with Washington and Knox would also go with him to meet Washington for the purpose of obtaining Fentanyl and Percocets. TT Vol. I, 146. When Lochirco wanted to make a drug purchase, he would contact him by cell phone. TT Vol. I, 147. Lochirco and Knox purchased Fentanyl and Percocets from Washington on multiple occasions and they did not purchase Fentanyl from any other sources. TT Vol. I, 147-48.

On March 10, 2006, Lochirco and Knox were working construction. TT Vol. I, 149-50. They got paid cash for the day's work and decided to call Washington on his cell phone so they could get drugs. TT Vol. I, 150. Knox used Lochirco's phone to contact Washington and Washington agreed to meet them on the Hardee's parking lot in Park Hills, Missouri. TT Vol. I, 150-51. Lochirco and Knox pooled their money so they could obtain more drugs. TT Vol. I, 153. They purchased two Fentanyl patches and some Percocet. TT Vol. I, 154. Washington carried the drugs in a black bag. TT Vol. I, 160. Washington removed the packaging from the Fentanyl patches so the tracking numbers would not be passed along. TT Vol. I, 159-60. Knox and Lochirco ingested the Fentanyl patches they

2

had obtained from Washington.  TT Vol. I, 155.

Lochirco and Knox went to Lochirco's residence and Knox was "visibly messed up."  TT Vol. I, 156.  Thereafter, Knox fell asleep on the floor.  TT Vol. I, 157.  When it was time to go to work the next morning, Lochirco attempted to wake Knox, but he was not breathing.  TT Vol. I, 157.  Lochirco told law enforcement officials that Washington was responsible for Knox's death.  TT Vol. I, 159.

Lacy Cole testified that she had a problem with "every drug," including prescription drugs.  TT Vol. II 236-37.  Heather Deering was her best friend and Deering also had a problem with prescription drugs.  TT Vol. II, 237-38.  In the months prior to Knox's death, Deering and she would obtain Percocets and Fentanyl patches from Washington.  TT Vol. II, 238-39.  Washington would bring Fentanyl and Percocet to her grandma's house while Cole was on house arrest.  TT Vol. II, 242.  Washington was paranoid about cutting the bar code off of the manfacturer's wrappers for the patches before distributing them.  TT Vol. II, 241. Cole, Deering, Lochirco and Knox were together and Lochirco and Knox expressed curiosity about the patches.  TT Vol. II, 243.  Deering called Washington and talked to him about getting patches for Lochirco and Knox.  TT Vol. II, 243.

Appellate Case: 08-3678    Page: 14    Date Filed: 06/26/2009 Entry ID: 3561263

Heather Deering testified that she met Burl Washington in November 2005. TT Vol. II, 349. Deering would purchase Fentanyl patches and Percocet from Washington two to three times a week. TT Vol. II, 350-51. Deering stated that Washington would carry the drugs in a fanny pack. TT Vol. II, 390. Prior to providing her with Fentanyl patches, Washington removed all traces of the manufacturer's labels. TT Vol. II, 352. Deering introduced her boyfriend, John Lochirco, and his friend, Justin Knox, to Washington for the purposes of purchasing Fentanyl patches and Percocets. TT Vol. II, 354.

Deering learned of Knox's death through Lacy Cole the morning after. TT Vol. II, 356. Deering testified that she had talked to Lochirco the night before and Lochirco had told her that he and Knox were "really messed up." TT Vol. II, 356. After Knox's death, Deering provided information to the police about her past purchases of Fentanyl and Percocets from Washington. TT Vol. II, 357. Det. Lance White discussed the possibility of Deering doing a controlled purchase from Washington. TT Vol. II, 357. Deering owed Washington $25 from a previous drug purchase and Deering did not believe he would sell to her unless she cleared the debt. TT Vol. II, 357.

On March 16, 2006, law enforcement officers reviewed the proper procedures for making a controlled purchase with Deering, searched her and her

4

home for controlled substances, and outfitted her residence with a recording device. TT Vol. II, 357-60. Deering placed a call to Washington's cellular telephone to order the narcotics, a recording of which was played for the jury. TT Vol. II, 362-65.

Law enforcement officers conducted surveillance outside Deering's residence. TT Vol II, 270-71. Officers recorded the in person meeting between Deering and Washington during which Washington provided her with two patches of Fentanyl in exchange for the $105 that had been provided to Deering by law enforcement to make the purchase. TT Vol. II, 368-73, 384. The recording of the transaction at Deering's residence was played for the jury. TT Vol. II, 367-70.

In the meantime, Det. Stacy received the final autopsy report from Dr. Zaricor which included the finding that Justin Knox died of a mixed narcotics overdose involving Fentanyl and Oxycodone. TT Vol. I, 119. Dr. Zaricor testified that there was certainly a lethal level of Fentanyl in the blood. TT Vol. II, 197-98.

Dr. Zaricor also testified about the Oxycodone that was found in Justin Knox's system. The toxicology revealed that a lethal level of Oxycodone had been present in Knox's system. TT Vol. II, 198.

5

Dr. Zaricor concluded that the cause of death was a mixed narcotic overdose of Fentanyl and Oxycodone.  TT Vol. II, 199.  Dr. Zaricor further testified that, independently of one another, each drug was in the system at one time in significant enough levels to kill Justin Knox.  TT Vol. II, 199-200.

Based on the foregoing autopsy report as well as the controlled purchase of Fentanyl patches by Deering, Det. Stacy applied for an arrest warrant for Burl Washington.  TT Vol. I, 119.  Heather Deering stated that she provided assistance to law enforcement in locating Washington on the date of his arrest.  Deering was asked to place a call to Washington and order more Fentanyl patches so that he would come toward her house and officers could apprehend him.  TT Vol. II, 281-82, 385.  Law enforcement monitored that call.  TT Vol. II, 281-82.

After Deering's call to Washington to order Fentanyl patches, Trooper Nathan Benson of the Missouri State Highway Patrol saw Washington travel in his vehicle and effected a traffic stop.  TT Vol. III, 439-52.  Trooper Benson informed Washington of his *Miranda* rights and asked if there was anything illegal in the vehicle.  TT Vol. III, 443-44.  Washington said no and that there were some patches in the car for a back injury he had sustained previously.  TT Vol. III, 444.

A search of Washington's vehicle revealed a black bag which contained multiple Fentanyl patches in their labels.  TT Vol. III, 445.  Additionally, Trooper

Appellate Case: 08-3678    Page: 17    Date Filed: 06/26/2009 Entry ID: 3561263

Benson located patches that were removed from their wrappers which were found on the floor board of the driver's side. TT Vol. III, 445-47. An air pistol was located under the driver's seat. TT Vol. III, 450.

Washington was taken to the station and interviewed by Det. Stacy. A videotape of that interview was played. TT Vol. I, 124. During that interview, Washington asserted that he had Fentanyl patches for pain prescribed to him by a doctor. Dr. Robert Wudel, Washington's osteopathic physician, testified that he had been Washington's physician since the summer of 2004. TT Vol. III, 470-72. Washington had suffered a fall in which he sustained an injury to his hip and femur. TT Vol. III, 472. Dr. Wudel prescribed Percocet (Oxycodone with acetaminophen) for Washington's pain and continued to do so regularly. TT Vol. III, 473-79. Washington continued to complain of pain and in October 2005, Dr. Wudel began to prescribe Fentanyl patches for Washington. TT Vol. III, 480. The Percocet prescriptions continued through this time as well. TT Vol. III, 481. These prescriptions continued through March 29, 2006. TT Vol. III, 485.

The jury also heard testimony from Joshua Rahlfs. TT Vol. III, 462. Rahlfs was charged with burglary and awaited trial at the Ste. Genevieve County Jail where he shared a pod with Washington. TT Vol. III, 463-64. During that time, Washington said that the cops didn't have anything on him and that no one saw

7

him sell the patches to the victim.  TT Vol. III, 464.  Washington admitted to Rahlfs that he had sold the drugs to "Justin" and that there was a guy named "John" involved as well.  TT Vol. III, 464-65.

Drug Enforcement Administration (DEA) Task Force Officer (TFO) Michael Bradley testified that he was the case agent responsible for locating witnesses, obtaining records and recordings in the case.  TT Vol. III, 496.  TFO Bradley obtained telephone records related to Washington's phone and highlighted calls between Washington and Lochirco occurring from February 6, 2006 through March 10, 2006.  TFO Bradley testified that the pattern and duration of the calls between Washington and Lochirco were consistent with a drug supplier and a drug customer.  TT Vol. III, 500-09.  Additionally, TFO Bradley obtained recordings of Washington and two different unidentified females discussing the circumstances of the case.  TT Vol. III, 515-18.

### *Procedural History*

A federal grand jury in the Eastern District of Missouri returned an indictment on December 20, 2007 charging Appellant/Defendant Burl Washington ("Washington") in a four-count indictment charging offenses involving fentanyl and oxycodone.  Specifically, Count I of the indictment alleged that on or about March 10, 2006, in St. Francois County, Missouri, Washington knowingly

8

distributed Fentanyl, a Schedule II controlled substance, and that the death of Justin Knox resulted.

Count II charged that on or about March 10, 2006, Washington knowingly distributed Oxycodone, a Schedule II controlled substance, and that the death of Justin Knox resulted.

Count III charged that on or about March 16, 2006, Washington distributed Fentanyl and Count IV charged that on or about April 19, 2006, Washington possessed with intent to distribute Fentanyl.

Assistant Federal Public Defender Janis Good was initially appointed to represent Washington on the charges. Thereafter, on January 29, 2008, Attorney Good filed a written waiver of the right to pursue pretrial motions. On February 27, 2008, the parties appeared for a status conference related to the waiver of pretrial motions. At that conference, Attorney Good requested that she "be allowed to withdraw" because it had come to her attention that her "relationship with Mr. Washington is in my opinion irretrievably broken." February 27, 2008 Status Conference Transcript ("SC"), 2. Judge Adelman ordered the matter to be heard ex parte and in camera and counsel for the Government was excluded from the courtroom. SC, 3.

Appellate Case: 08-3678    Page: 20    Date Filed: 06/26/2009 Entry ID: 3561263

During that hearing, Attorney Good, who has practiced law for more than 20 years (SC, 4), informed the court that she had "spent three and a half hours with Mr. Washington" and that they "accomplished little or nothing." SC, 4. Washington and Attorney Good disagreed as to the status of the attorney-client relationship and Attorney Good summarized the problem. SC, 5-6.

> Your honor, I guess I can't describe it any better than Mr. Washington and I cannot even agree on the perception of our own relationship. I will tell you, Your Honor, that the discussions we've had have been heated. They are not what I would say productive, but as soon as I stated that possibly he needed other counsel, Mr. Washington couldn't have disagreed with me more. I think that that's the core problem in our relationship, Your Honor. I say yes, he says no. If I then say no, he says yes. I think that that is grounded in a personality conflict that is not overcomable, and the fact is that not only can it not be overcome, but there isn't really enough time.

SC, 5-6. As Judge Adelman considered the issue, Washington indicated that he supported Attorney Good's withdrawal. SC, 7.

The court appointed Attorney Ronald Jenkins, who had over 30 years experience, to represent Washington on March 3, 2008. (*See* Docket Text, March 3, 2008). On March 14, 2008, Attorney Jenkins filed a motion to suppress recordings of telephone conversations. A hearing was held on that motion on April 2, 2008. Judge Adelman took the matter under submission. While the motion was under consideration, Washington filed with the court a pro se motion alleging that he had received "insufficient assistance of counsel." On May 1, 2008, Judge

10

Adelman held a hearing regarding Washington's concerns with his attorney. Again, the hearing was held ex parte and in camera.

Washington expressed dissatisfaction with Attorney Jenkins but did not ask for replacement counsel. May 1, 2008 Hearing Transcript ("Hrg. Tr."), 2-11. During that hearing, Washington complained that "Mr. Jenkins is not pursuing this matter as ... the lie that I claim it to be." Hrg. Tr., 3. Judge Adelman informed Washington that the proper time to raise such claims was at trial. Hrg. Tr., 4. The court then recommended that Washington continue to work with Attorney Jenkins, an attorney experienced in complicated cases. Hrg. Tr., 5.

Attorney Jenkins filed several pretrial notices and motions including motions in limine. One of those notices was termed a "Notice of No Rule 404(b) Evidence." On June 4, Washington filed a pro se "Request by Burl Washington to be Heard on June 11, 2008." *See* Docket Entry 39.

On June 11, 2008, the parties appeared for jury selection. Trial Transcript, Volume I ("TT Vol. I"), 3. Prior to the venire panel being brought in, Washington was permitted to address the court. TT Vol. I, 4. Washington alleged to the district court that the entire case against him was based upon false declarations and charges inconsistent with the autopsy report. TT Vol. I, 5, 6. The district court informed Washington that the purpose of trial is to let a jury determine what is

11

false and what is not. TT Vol. I, 5.

Washington went back and forth with the court over these same issues for a significant amount of time, *see* TT Vol. I, 7-12, and then informed the court that he had never discussed these matters with his lawyer. TT Vol. I, 12. Attorney Jenkins requested that the Government be excused from the courtroom so that matters protected by the attorney/client privilege could be discussed. TT Vol. I, 13. Thereafter, Attorney Jenkins detailed the dates and lengths of his visits with Washington as well as 14 letters he had written him. TT Vol. I, 14-15. Additionally, Attorney Jenkins detailed his efforts to negotiate a beneficial plea agreement with the Government. TT Vol. I, 15. Washington disagreed with Attorney Jenkins' version of the events and denied knowing about the plea offer. TT Vol. I, 16-17.

Washington continued to complain about the representation he was receiving from Attorney Jenkins. TT Vol. I, 29-33. Judge Perry told Washington that he had benefitted from representation by two of the most experienced criminal defense attorneys that practice in the district court. TT Vol. I, 33.

Judge Perry then afforded Washington and Attorney Jenkins an opportunity to discuss the plea agreement. TT Vol. I, 36-38. The Government provided final *Jencks* material to Attorney Jenkins. TT Vol. I, 52. After a recess, the remaining

12

pretrial issues were resolved.  TT Vol. I, 38-55.  Thereafter, jury selection proceeded.

On June 16, 2008 the parties appeared before the district court to resolve any last minute issues prior to the commencement of the trial.  Attorney Jenkins informed the district court that Washington wished to make an announcement.  TT Vol. I, 59.  At that time, Washington told the court, "I would like to proceed pro se, Your Honor."  TT Vol. I, 60.  The court asked for clarification and Washington said, "I would like to represent myself."  The court asked, "Why on earth would you want to do that at this point in the case?"  TT Vol. I, 60.  Washington responded with complaints about Attorney Jenkins arguing that Jenkins failed to share discovery with him, would not talk about the case and walked out on him during meetings. TT Vol. I, 60-62.

The court asked whether Washington was prepared to make an opening statement and cross-examine witnesses in twenty minutes when the jury came in. TT Vol. I, 62.  Washington responded, "More so than he [Jenkins] is, yes."  TT Vol. I, 62.  The court then told Washington, "I think it would be a grave, grave mistake for you to try and represent yourself in this case.  This is a serious case.  If convicted of Counts I and II, you're facing a mandatory 20-year sentence.  You understand that?"  TT Vol. I, 62.  Washington acknowledged his understanding

13

that the range of punishment was from twenty years to life.  TT Vol. I, 62.  Judge

Perry then provided very specific cautions about the severity of the case and her

belief that Washington should not proceed pro se.  TT. Vol. I, 63-65.

At that point, Washington asked the court for more time with Attorney

Jenkins.  TT Vol. I, 65.  That request was denied.  TT Vol. I, 65.

Attorney Jenkins and Washington approached the bench and had

communications with the court outside the hearing of the Government.  At the

conclusion of those proceedings, the court informed Washington:

> We're going to go forward with this trial, and you can either have Mr.
> Jenkins represent you, or you can do it on your own.  You have a
> constitutional right to represent yourself if that's what you want to do.  But,
> if you decide to represent yourself, you can't ever come back later and say
> that you thought I shouldn't have let you represent yourself, you'll be
> making that decision.  It think it's a huge mistake.  Your chances are way,
> way better with Mr. Jenkins than they are representing yourself.

TT Vol. I, 69.

Washington inquired about whether or not they would both be able to speak

and the court informed him that it had to be one or the other, not both.  TT Vol. I,

69.  Washington said, "I'll represent myself."  TT Vol. I, 69.

The district court then advanced the possibility of whether Washington may

prefer to wait until the end of the first day of trial to begin self-representation,

allowing Attorney Jenkins to start or allow Attorney Jenkins to represent him and

14

then be permitted to speak to the court during recesses if problems arose. TT Vol. I, 70-71.

Upon those suggestions, Attorney Jenkins voiced concerns about proceeding and stated that "[i]t is absolutely impossible to represent this individual." TT Vol. I, 72. The district court then stated:

> It's your right to represent yourself constitutionally if you want to. Even with what Mr. Jenkins said, even with the problems you both have described, I still think you are far better off having him represent you than representing yourself. But it is your constitutional right, and if that's what you want to do, then I think you're competent, you understand what you're doing, you're not incompetent, and nobody is forcing you to do that, so I'm obliged to allow you to do it if you are demanding that right.

TT Vol. I, 73.

Judge Perry again reminded Washington that once the decision to represent himself was made, he would not be permitted to change his mind. TT Vol. I, 74. A recess was afforded so that Washington could talk with Attorney Jenkins and make his decision. TT Vol. I, 74.

Following the recess, the district court asked, "Are you requesting to represent yourself in this case?" and Washington responded, "Yes." TT Vol. I, 74. The court again inquired as to whether Washington wanted to represent himself and he again responded in the affirmative. TT Vol. I, 75. The district court made the following findings:

15

I find that that is an unequivocal assertion of your constitutional right to represent yourself. I find that you are competent to make that determination, you understand your rights, and you know what you're doing. No one is forcing you to do this. It is a voluntary waiver. I have advised you that I think it's the wrong thing to do, but do you have the right to do it, and so that's how we will proceed.

TT Vol. I, 75-76.

Attorney Jenkins provided Washington with folders containing notes for cross-examination of each of the Government's witnesses. TT Vol. I, 76. The district court determined that under the circumstances, no purpose would be served by requiring Attorney Jenkins to serve as standby counsel. TT Vol. I, 76-77. Washington expressed interest in help from Attorney Jenkins, but the district court informed him about the limited procedural role of standby counsel and released Attorney Jenkins from representation. TT Vol. I, 79.

The trial proceeded with Washington representing himself. At the conclusion of the Government's evidence, the district court assisted Washington in making a motion for judgment of acquittal. TT Vol. III, 524-35. Washington stated that he would be presenting witnesses and evidence. TT Vol. III, 526. Washington offered no witnesses except the Government's witnesses he wished to recall. Because he proposed no new line of questioning, they were not allowed. TT Vol. III, 527-34. Next, Washington presented a litany of exhibits he wanted to admit, including police reports, TT Vol. III, 536, 539, 547; deposition transcripts,

16

TT Vol. III, 543, 544, 545; research on Fentanyl, TT Vol. III, 545; a preliminary hearing transcript, TT Vol. III, 545; and the Government's response to defendant's motion to suppress recordings, TT Vol. III, 549. The district court admitted some and refused to admit some of Washington's exhibits. TT Vol. III, 551-53. Washington asked for more time in which to prepare his closing argument. TT Vol. III, 554-55. The court agreed to close the evidence and give Washington until the morning. TT Vol. III, 555.

After lunch, Washington again talked about recalling witnesses. TT Vol. III 558-59. When it became evident that the court was not going to allow that, Washington asked for a doctor. TT Vol. III, 559. The court agreed to allow Washington to be examined by a doctor, but added, "I'm highly suspicious of your illness. I believe you are a malingerer." TT Vol. III, 562.

The next morning, the trial resumed. Before the jury was brought in, the court reviewed the medical report she was provided which related to Washington's condition. He was diagnosed with anxiety, but found fit for confinement and trial. TT Vol. IV, 572. A jury instruction conference then occurred as well as a rehash of Washington's proposed exhibits. TT Vol. IV, 573-94. Washington complained that he needed legal consultation. TT Vol. IV, 594. The court explained that he chose to represent himself and that standby counsel only assists with procedural

17

matters.  TT Vol. IV, 594-95.  Washington moved for a mistrial based on his incompetence with respect to Court procedures.  TT Vol. IV, 621.  The motion was denied.  TT Vol. IV, 621.

The parties made their closing arguments.  TT Vol. IV, 629-62.  The jury returned verdicts of guilty on all four counts of the indictment.  Docket Entry #61.

Prior to the sentencing hearing in the case, Washington filed numerous motions and objections to the pretrial services report.  Sentencing was initially set for September 12, 2008.  Docket Entry #56.  During the sentencing, Washington again complained about his lack of legal assistance.  September 12, 2008 Sentencing Hearing Transcript ("ST #1"), 5-9.  He also repeatedly requested standby counsel to assist him in the sentencing hearing.  ST #1, 9, 14.  Judge Perry then decided to appoint standby counsel and postpone the sentencing hearing.  ST #1, 27.

The district court appointed standby counsel, Daniel Juengel, to assist Washington at sentencing.  Docket Entry #96.  The sentencing hearing resumed on November 7, 2008.  November 7, 2008 Sentencing Hearing Transcript ("ST #2"), 1.  The court heard argument and took testimony on Washington's objections to the presentence investigation report ("PSR").  ST #2, 18-40.  Attorney Juengel was permitted to speak on Washington's behalf at several instances during the hearing

18

and he conducted cross-examination of the United States Probation Officer. ST #2, 31. After hearing all of the evidence, arguments and allocution, the district court imposed a guideline sentence of 360 months imprisonment on Counts I and II and 240 months on Counts III and IV, all to run concurrently. ST #2, 87-88. Additionally imposed was restitution in the amount of $6,768.86 to Justin Knox's mother, Rose Marler, for funeral expenses. ST #2, 88. Washington also received a five-year term of supervised release and a $400 special assessment. ST #2, 88, 90.

Washington's counsel timely filed the instant appeal on his behalf.

Appellate Case: 08-3678     Page: 30     Date Filed: 06/26/2009 Entry ID: 3561263

## SUMMARY OF ARGUMENT

Washington raises four issues on appeal. First, Washington contends that the district court erred in permitting him to represent himself. The record clearly demonstrates that Washington unequivocally invoked his right to represent himself and he was not entitled to standby counsel.

Next, Washington argues that the evidence presented at trial was insufficient to support the verdict related to the death of Justin Knox. The evidence in the case established that Washington distributed Percocets and Fentanyl patches to Justin Knox and John Lochirco, that Knox ingested the substances and died as a result. The evidence established that Percocet is a combination of Oxycodone and acetaminophen. Dr. Michael Zaricor testified that each drug, Fentanyl and Oxycodone, was present in Knox's body in lethal levels at some point. Additionally, testimony showed that acetaminophen metabolizes in the body faster than Oxycodone and that if Percocet was ingested, it would not be surprising not to find acetaminophen in the blood. All of the testimony supports the jury's verdict on Counts I and II.

Thirdly, Washington argues that the district court erred in allowing evidence pursuant to Federal Rule of Evidence 404(b). Specifically, Washington cites certain testimony by John Lochirco, Heather Deering and Lacy Cole and argues

20

that it was improper 404(b) evidence. To the contrary, the evidence about which Washington complains was intrinsic to the crimes charged, it gave context to the witnesses' relationships with Washington and did not constitute 404(b) evidence. In the alternative, even if the Court concludes that the evidence is properly classified as prior bad acts evidence, actual notice of the evidence was provided and it was admissible under the strictures of 404(b) and created no serious effect on the judicial proceedings which would require reversal for plain error.

Lastly, Washington argues that the district court erred in submitting jury instructions 17 and 18 and alleges that they were improper statements of the law and logically incoherent, mutually exclusive conclusions. Instructions 17 and 18 were accurate and proper statements of law and were not legally inconsistent nor did they call for mutually exclusive legal findings because the evidence presented demonstrated that either the Fentanyl or the Oxycodone alone would have killed Justin Knox.

Appellate Case: 08-3678    Page: 32    Date Filed: 06/26/2009 Entry ID: 3561263

# ARGUMENT

## I. THE DISTRICT COURT PROPERLY GRANTED WASHINGTON'S CLEAR AND UNEQUIVOCAL REQUEST TO REPRESENT HIMSELF

Despite his clear and unequivocal request before the district court to represent himself just prior to opening statements in this case, Washington now argues that he should not have been afforded the right to represent himself because he was not properly found fully competent to waive his Sixth Amendment right to counsel and that he was unconstitutionally deprived of counsel, thus justifying a finding of reversible error. Because Washington clearly and unequivocally invoked his right to self-representation, the district court was compelled to grant his request to execute this constitutional right.

### Standard of Review

A district court's decision to allow a defendant to represent himself is reviewed de novo. *United States v. Mahasin*, 442 F.3d 687, 691 (8th Cir. 2006). This Court will uphold the district court's decision to allow a defendant to represent himself and affirm the conviction if the record shows that the court adequately warned him of the risks in representing himself, or that, under all the circumstances, he understood the dangers and disadvantages of self representation. *United States v. Patterson*, 140 F.3d 767, 774-75 (8th Cir. 1998).

22

*Analysis*

Just as a criminal defendant has a constitutional right to the assistance of counsel at trial, he has a constitutional right to waive counsel and conduct his own defense. *Farretta v. California*, 422 U.S. 806 (1975). Because a defendant electing self-representation gives up many of the traditional benefits associated with the right to counsel, he must do so knowingly and intelligently. *Id.* at 835, *citing Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938).

This Court has held that "[a] defendant who wishes to waive his right to counsel, and thereby to proceed pro se, must do so clearly and unequivocally." *United States v. Light*, 406 F.3d 995, 999 (8th Cir. 2005), *quoting United States v. Webster*, 84 F.3d 1056, 1062 (8th Cir. 1996). Thereafter, the defendant must be made aware of the "dangers and disadvantages of self-representation." *Light*, 406 F.3d at 999, *quoting Reese v. Nix*, 942 F.2d 1276, 1280 (8th Cir. 1991). Although defendant should be advised of the potential pitfalls of proceeding pro se, his technical legal knowledge is not relevant to determining whether he is competent to make that decision. *Faretta*, 422 U.S. at 834. "Thus, while it is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts, a criminal defendant's ability to represent himself has no bearing upon his competence to choose

23

self-representation." *Godinez v. Moran*, 509 U.S. 389, 400 (1993), *quoting Farretta*, 422 U.S. at 834 (internal quotations and citations omitted). So, although a defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored." *Id.*

This Court has held that the trial court is required to ensure "only that [the defendant] understands the risks involved in representing himself and that he has knowing and intelligently chosen self-representation." *United States v. Patterson*, 140 F.3d 767, 774 (8th Cir. 2006).

First and foremost, despite his contentions to the contrary, Washington clearly and unequivocally invoked his right to self-representation. After pretrial issues were resolved and jury selection occurred on June 11, 2008, trial proceedings were ready to reconvene on June 16, 2008, five days later. At the beginning of the day on June 16, 2008, Washington told the district court, "I would like to proceed pro se, Your Honor." TT Vol. I, 60. This was not a statement that was vague or inconclusive, it was not ambiguous in any way. The court asked for clarification and Washington said, "I would like to represent myself." TT Vol. I, 60.

After the initial invocation of his right to self-representation, the court asked, "Why on earth would you want to do that at this point in the case?" TT Vol. I, 60.

24

Washington responded to the Court's inquiries with complaints about Attorney Jenkins arguing that Jenkins failed to share discovery with him, would not talk about the case and walked out on him during meetings. TT Vol. I, 60-62. These allegations echoed ones made by Washington on June 1, 2006. TT Vol. I, 14. Attorney Jenkins presented detailed information regarding his meetings and correspondence with Washington, TT Vol. I, 14-15, which belied Washington's statements. Judge Perry noted Washington's own contradictions, "[y]ou told me before you never talked about the case, but there were things you said you discussed with him." TT Vol. I, 61.

The court asked if Washington was prepared to make an opening statement and cross-examine witnesses in twenty minutes when the jury came in. TT Vol. I, 62. Washington responded, "More so than he [Jenkins] is, yes." TT Vol. I, 62.

As is the favored practice by this Court, Judge Perry then provided very specific cautions about the severity of the case and her belief that Washington should not proceed pro se. *See United States v. Yagow*, 953 F.2d 427, 431 (8th Cir. 1992), *citing United States v. Christian*, 861 F.2d 195, 197-98 (8th Cir. 1989). *Christian*, 861 F.2d at 197, the court upheld the district court's decision to allow defendant to proceed pro se where he was found to be articulate and intelligent, he understood the nature of the charges and the risks of a guilty verdict, and he knew

25

he would be bound by the rules of evidence and criminal procedure, despite his lack of familiarity with those rules.

The following colloquy took place between Judge Perry and Washington: "I think it would be a grave, grave mistake for you to try and represent yourself in this case. This is a serious case. If convicted of Counts I and II, you're facing a mandatory 20-year sentence. You understand that?" TT Vol. I, 62. Washington replied, "I do understand that." TT Vol. I, 62. The court stated, "With a maximum of life imprisonment" and Washington again stated, "I understand that." TT Vol. I, 62.

The district court further explained in detail what would happen if Washington were to waive his right to counsel:

> Here is what would happen if you represented yourself. The jury is going to come in here in 20 minutes, and the Government is going to make its opening statement, and I'm going to ask if you wish to make an opening statement, or you wish to reserve that until the beginning of your case. That's the first decision you have to make. Then would you [sic] have to make an opening statement. Then the Government would start calling witnesses, and you would have to cross-examine them.
>
> You will have to follow the Rules of Evidence. If you're representing yourself, you are bound by the same Rules of Evidence that anyone else is, so on cross-examination you have to ask proper questions, and they have to be admissible. If you make objections, you have to state the legal ground for your objection. It can't be an objection that you think they are not telling the truth. That is not an objection. That seemed to be your biggest complaint the other day is you thought Government witnesses were lying. Well, that's not an objection to their testimony. You can cross-examine them and try to

26

show that they are lying, but I can assure you Mr. Jenkins will be able to do that much better than you can because he's done it many, many times before, and if they are lying, he will be able to point out the areas that the jury should consider in assessing their credibility. For a defendant to do that by himself is a very difficult thing.

TT Vol. I, 63-64.

Washington acknowledged that "I believe it is." TT Vol. I, 64. The court

when on to further explain:

Then, when the Government rests its case, you would have to present evidence. Well, you wouldn't have to present evidence. You would have to decide whether you wish to present evidence. You can make an opening statement at the beginning of the case, but that's not testimony, it's not under oath, and if you didn't testify, the jury would be told that they can't consider that as evidence. They could only consider it as your argument as the lawyer.

You could testify if you wanted to, but obviously, you do not have to testify. You have a privilege against self-incrimination, and there is no burden on you whatsoever to present any testimony or any evidence of any kind. The burden is solely on the Government to prove - to try to prove that you're guilty beyond a reasonable doubt, so you don't have to do any of that, but if you choose to do it, then you would have to present whatever evidence you wanted to present.

If you decided to try to represent yourself, if you didn't - in other words, if you decided to testify, you could, but if you didn't testify, the jury can't take whatever you might tell them on opening statement or on cross-examination as evidence. In other words, you have to take the oath and be a witness if you're going to be a witness, so you have to keep those two roles separate.

After the evidence is completed we would have closing arguments. I would give the jury instructions on the law. The law is pretty well established in this case. The instructions are pretty cut and dried, but we

27

would have issues to talk about.  I'm sure there are legal issues about the instructions that you should raise, but I can't tell you what those are, and it will be your job to do that.

I just don't see how in the world you can be prepared to do that at this time.  Is that you're asking me to do, not to have Mr. Jenkins on this case for you?

TT Vol. I, 64-65.

Following this thorough description of the potential pitfalls of proceeding pro se, Washington asked the court for more time with Attorney Jenkins.  TT Vol. I, 65.  That request was denied.  TT Vol. I, 65.  "A trial judge has broad discretion in deciding whether to grant or deny a motion for a trial continuance." *United States v. Myers*, 503 F.3d 676, 680 (8th Cir. 2007).   Additionally, the district court had previously made a finding about Washington's allegations regarding Attorney Jenkins' performance:

I listened to you for an hour and a half on Wednesday when you talked to me about the problems and the things you thought were wrong, and frankly, none of it sounds like anything that should cause you to want to get rid of your lawyer.  I mean, I think you're seeking perfection or something, a miracle worker.

TT Vol. I, 63.  Washington had been afforded two competent, experienced criminal defense attorneys at this point in the case and had not been able to get along with either.  *United States v. Garey*, 540 F.3d 1253, 1263 (11th Cir. 2008) (noting that the Sixth Amendment does not grant defendants the unqualified right to counsel of

28

their choice and that indigent criminal defendants do not have a right to demand a different appointed lawyer absent good cause).

Attorney Jenkins and Washington approached the bench and had communications with the court outside the hearing of the Government. At the conclusion of those proceedings, the court informed Washington:

> We're going to go forward with this trial, and you can either have Mr. Jenkins represent you, or you can do it on your own. You have a constitutional right to represent yourself if that's what you want to do. But, if you decide to represent yourself, you can't ever come back later and say that you thought I shouldn't have let you represent yourself, you'll be making that decision. It think it's a huge mistake. Your chances are way, way better with Mr. Jenkins than they are representing yourself.

TT Vol. I, 69. "A defendant has no right to manipulate his right to counsel in order to delay or disrupt the trial." *Berry v. Lockhart*, 873 F.2d 1168, 1171 (8th Cir. 1989).

Washington inquired about whether or not they would both be able to speak and the court informed him that it had to be one or the other, not both. TT Vol. I, 69. Even Washington admits that there is no right to hybrid representation. *See* Appellant's Brief, 42, n.6, *citing United States v. Mentzos*, 462 F.3d 830, 839 (8th Cir. 2006) (defendant's request for hybrid representation within trial court's discretion to deny). In the face of all of this information, Washington persisted in his earlier position and stated, "I'll represent myself." TT Vol. I, 69.

29

The district court then advanced the possibility of whether Washington may prefer to wait until the end of the first day of trial to begin self-representation, allowing Attorney Jenkins to start or allow Attorney Jenkins to represent him and then be permitted to speak to the court during recesses if problems arose.  TT Vol. I, 70-71.

Upon those suggestions, Attorney Jenkins voiced concerns about proceeding and stated that "[i]t is absolutely impossible to represent this individual."  TT Vol. I, 72.  The district court then stated:

> It's your right to represent your self constitutionally if you want to. Even with what Mr. Jenkins said, even with the problems you both have described, I still think you are far better off having him represent you than representing yourself.  But it is your constitutional right, and if that's what you want to do, then I think you're competent, you understand what you're doing, you're not incompetent, and nobody is forcing you to do that, so I'm obliged to allow you to do it if you are demanding that right.

TT Vol. I, 73.

Judge Perry again reminded Washington that once the decision to represent himself was made, he would not be permitted to change his mind.  TT Vol. I, 74. A recess was afforded so that Washington could talk with Attorney Jenkins and make his decision.  TT Vol. I, 74.

Following the recess, the district court asked, "Are you requesting to represent yourself in this case?" and Washington clearly and unequivocally

30

responded, "Yes." TT Vol. I, 74. The district court again advised defendant of the charges and range of punishment and defendant acknowledged that he understood both. TT Vol. I, 75. The court again inquired as to whether Washington wanted to represent himself and he again responded in the affirmative. TT Vol. I, 75. The district court made the following findings:

> I find that that is an unequivocal assertion of your constitutional right to represent yourself. I find that you are competent to make that determination, you understand your rights, and you know what you're doing. No one is forcing you to do this. It is a voluntary waiver. I have advised you that I think it's the wrong thing to do, but do you have the right to do it, and so that's how we will proceed.

TT Vol. I, 75-76.

This colloquy undoubtedly demonstrates that the district court more than adequately warned Washington of the dangers and disadvantages of self representation and accordingly, the decision to allow him to proceed pro se must be affirmed. *See Patterson*, 140 F.3d at 774-75; *United States v. Stewart*, 20 F.3d 911, 917 (8th Cir. 1994); *United States v. Veltman*, 9 F.3d 718, 720 (8th Cir. 1993). In addition to the express warnings provided on the record, this Court is permitted to examine the record as a whole to determine whether the district court acted properly in granting Washington's request for self-representation. *See United States v. Mahasin*, 442 F.3d 687, 691 (8th Cir. 2006) (holding that a waiver is valid if the district court adequately warned defendant or if, on the record as a whole,

31

defendant knew and understood the disadvantages of self-representation). An examination of the trial record as a whole demonstrates that Washington was articulate, asked appropriate cross-examination questions of the witnesses, challenged their version of events and gave an intelligent closing argument. *See Christian*, 861 F.2d at 197. In the face of the explicit warnings on the record as well as the record as a whole of Washington's pro se representation, there is simply no basis for overruling the district court's decision to allow Washington to exercise his constitutional right to self representation.

This Court has recognized the problem faced by trial courts in these situations:

> The tension created by the mutual exclusivity of the right to counsel and the right to self-representation places a trial court in a precarious position. If it grants a request for self-representation, the defendant can argue on appeal that [he] did not knowingly and intelligently waive his right to counsel.

*Light*, 406 F.3d at 999.

Defendant now cites *Berry v. Lockhart*, 873 F.2d 1168 (8th Cir. 1989) in support of his assertion that he did not knowingly and intelligently waive his right to counsel, claiming his choice was not made with "eyes open." Appellant's Brief, 35. *Berry* is completely distinguishable from the instant case because in that case there was no dispute that the district court did not advise the defendant of the perils

32

of proceeding pro se and he steadfastly asked for counsel.  *Id.* at 1171.

Washington's citation to various other cases where the defendant was not warned

about the risks of self representation are similarly unpersuasive because they are

distinguishable from the instant case wherein the district court gave extensive

warnings on the record to Washington.  *See Gilbert v. Lockhart*, 930 F.2d 1356

(8th Cir. 1991); *Ferguson v. Bruton*, 217 F.3d 983 (8th Cir. 2000) and *Meyer v.*

*Sargent*, 854 F.2d 1110 (8th Cir. 1988).

   Next, Washington argues that his request to invoke his constitutional right to

self representation was not clear and unequivocal.  That claim is belied by the

record.  On numerous occasions, Washington clearly informed the court of his

wishes to proceed pro se.  TT Vol. I, 69, 74, 75.  Washington further argues that he

wished to be assisted by standby counsel and therefore his request to represent

himself was somehow invalid.  It is clear, however, that "[a]ppointment of standby

counsel is within the discretion of the district court, and a *pro se* defendant does

not enjoy an absolute right to standby counsel.  *United States v. Webster*, 84 F.3d

1056, 1063 (8th Cir. 1996); *see also United States v. Swinney*, 970 F.2d 494, 498

(8th Cir. 1992) ("[T]he district court may properly require the defendant to choose

either to proceed *pro se*, with or without the help of standby counsel, or to utilize

the full assistance of counsel....").

Appellate Case: 08-3678     Page: 44     Date Filed: 06/26/2009 Entry ID: 3561263

Here, the district court clearly recognized these principals of law and found that having Attorney Jenkins as standby counsel would be ineffective. TT Vol. I, 76-77. When Washington did explicitly request standby counsel at sentencing, Judge Perry granted the request and postponed the hearing to allow for appointment of standby counsel and preparation of the trial transcript. ST #1, 1, 9, 14, 27.

Next, Washington boldly asserts that his motion was untimely and should have been denied. He cites *United States v. Edelmann*, 458 F.3d 791 (8th Cir. 2006), in which this Court stated that "[o]nce the defendant makes a clear and unequivocal request to represent himself, a court may nonetheless deny the request in certain circumstances," for instance if the request is not made in a timely manner or if defendant engages in obstructionist conduct. *Id.* at 808. This case does not stand for the proposition that the trial court must deny a request for self-representation in these circumstances, only that it may exercise its discretion if it so chooses. *Id.*

Appellate Case: 08-3678     Page: 45     Date Filed: 06/26/2009 Entry ID: 3561263

Washington also cites a litany of cases wherein defendants' motions to proceed pro se were rejected because they were based on a motive to delay and manipulate the proceedings. Appellant's Brief, 45 n.7. Again, all of these cases recognize the trial court's discretion to deny a request on that basis, they do not say that the district court must look beyond a defendant's clear and unequivocal invocation of his right to self-representation and deny the request based on suspected motives which Washington presents against himself after the fact. Washington, who made the motion cannot now attack the acceptance of the motion. *Christian*, 861 F.2d at 197 n.2.

Finally, Washington argues that the district court failed to adequately investigate his competence. The standard of competency for pleading guilty or waiving right to counsel is the same as the competency standard for standing trial. *Godinez v. Moran*, 509 U.S. 389 (1993). In *Godinez*, the Supreme Court rejected the argument that a higher competency standard is necessary where a defendant represents himself and found that "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." *Id.* at 399 (emphasis in original).

The district court's lengthy interactions with Washington coupled by careful review of all of his pro se pleadings as well as its observation of Washington in

35

court were more than sufficient to support a finding of his competence to stand trial and waive his right to counsel.  There is nothing in the record whatsoever that suggests that Washington was incompetent.

Wherefore, in light of the foregoing, the district court's decision to allow Washington to proceed pro se must be affirmed.

## II.   THE EVIDENCE PRESENTED WAS MORE THAN SUFFICIENT TO SUPPORT THE VERDICTS

Washington next argues that the evidence presented at trial was insufficient to support the verdicts on Counts I and II.  The evidence presented at trial was more than sufficient to support the verdicts on all four counts.  Accordingly, any argument that the verdict should be overturned must be rejected.

### Standard of Review

The court of appeals reviews the sufficiency of the evidence supporting a conviction de novo, viewing evidence in the light most favorable to the government and resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict.  *United States v. Farrell*, 563 F.3d 364, 365 (8th Cir. 2009), *quoting United States v. Phythian*, 529 F.3d 807, 811 (8th Cir. 2008).

Appellate Case: 08-3678     Page: 47     Date Filed: 06/26/2009 Entry ID: 3561263

*Analysis*

Washington argues that the Government failed to prove one of the essential elements of the crimes charged in Counts I and II, namely that the death of Justin Knox resulted from the distribution of Fentanyl and Oxycodone.

A jury's verdict will only be overturned if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Thomas*, 565 F.3d 438, 441 (8th Cir. 2009), *quoting United States v. Harmon*, 194 F.3d 890, 892 (8th Cir. 1999). "Under this stringent standard, a verdict will be overturned 'only in rare cases.'" *United States v. Jones*, 559 F.3d 831, 835 (8th Cir. 2009), *quoting United States v. Lee*, 356 F.3d 831, 836 (8th Cir. 2003). Washington asserts that first because the autopsy report indicated the cause of Knox's death was a mixed narcotics overdose that the verdicts on Counts I and II are somehow inconsistent.

To demonstrate that Washington was guilty of Count I, the Government had to show that:

> One, the defendant intentionally distributed Fentanyl to another person;
>
> Two, at the time of the distribution, the defendant knew that it was a controlled substance; and
>
> Three, the death of Justin Knox resulted from the use of Fentanyl so distributed by the defendant.

Appellate Case: 08-3678    Page: 48    Date Filed: 06/26/2009 Entry ID: 3561263

Instruction No. 11, attached hereto in Addendum, 1.

Washington does not contest the sufficiency of the evidence as to the first two elements of Count I, he simply alleges that no reasonable juror could find that death resulted as a result of the use of Fentanyl.

To the contrary, the testimony of both Dr. Michael Zaricor and Dr. Christopher Long amply support a finding that Knox died as a result of the use of the Fentanyl. Dr. Zaricor took blood and urine samples from Knox on March 11, 2006 and forwarded those samples to the St. Louis County Medical Examiner's toxicology lab. TT Vol. II, 195-96. Upon analysis of that report, coupled with his examination of Knox's body, he concluded that the cause of death was a mixed narcotics overdose of Fentanyl and Oxycodone. Further, Dr. Zaricor testified that there was well in excess of a lethal level of Fentanyl in Knox's system. TT Vol. II, 197-99.

Dr. Long testified that the level of Fentanyl found in Knox's blood was 5.3 nanograms per milliliter which is consistent with concentrations that have produced a lethal result. TT Vol. II, 225-26. Dr. Long also testified that the level of Fentanyl present in the urine was greater than 200 nanograms per milliliter, the maximum for which it is tested. TT Vol. II, 227. That level in the urine supports a finding that the blood previously had a fatal level of Fentanyl and the body was

38

trying to eliminate that toxin and that is consistent with the blood producing a fatality. TT Vol. II, 227-28.

> To prove defendant's guilt as to Count II, the Government had to prove:
>
> One, the defendant intentionally distribute Oxycodone to another person;
>
> Two, at the time of the distribution, the defendant knew that it was a controlled substance; and
>
> Three, the death of Justin Knox resulted from the use of Oxycodone so distributed by the defendant.

Instruction No. 12, attached hereto in Addendum, 2.

Washington makes the same sufficiency challenge to this Court. Again, this argument is without merit. The evidence showed that the level of Oxycodone found in Knox's blood was .05 micrograms, but the Oxycodone levels in the urine were greater than two micrograms per milliliter which demonstrated that most of the Oxycodone was metabolized, but death occurred before. TT Vol. II, 198. Dr. Zaricor testified that the toxicology report showed that a lethal level of Oxycodone had been present in the system. TT Vol. II, 198.

So, although the cause of death was a mixed narcotic overdose of Fentanyl and Oxycodone, Dr. Zaricor testified that independently of one another, each drug was in the system at one time in significant enough levels to kill the decedent. TT Vol. II, 199-200.

39

After all of the instructions had been reviewed, the jury did inquire "If the cause of death is mixed narcotic overdose, why are the two drugs seperated [sic] into 2 different charges."  Appellant's Brief, Addendum, 1.  This question demonstrates that the jury considered this issue carefully.  The jury had been directed, in portions of both Instruction No. 17 and Instruction No. 18 that:

> All that the Government must prove beyond a reasonable doubt is that the defendant intentionally distributed Fentanyl and that but for Justin Knox's use of the Fentanyl that defendant distributed, Justin Knox would not have died.

> All that the Government must prove beyond a reasonable doubt is that the defendant intentionally distributed Oxycodone and that but for Justin Knox's use of the Oxycodone that defendant distributed, Justin Knox would not have died.

Instruction Nos. 17 and 18, Addendum, 3, 4.

After consideration of the instructions, which were all proper and correct statements of the law, as well as the evidence as described herein, the jury returned a verdict of guilty on Counts I and II.

Washington's argument that these verdicts are inherently contradictory are baseless.  Because Knox would not have died but for the distribution of Fentanyl and Oxycodone, both of which were present in his body at lethal levels, the verdicts on Counts I and II are supported by the evidence.  Any finding by this Court to the contrary would allow a drug dealer who distributed at least two

40

controlled substances to someone who ingested them in lethal levels to escape liability under this statute. That was clearly not the intention of Congress. The defense argues that the Government should have pleaded the case "in the alternative" or as "a mixture." In the event the Government had pursued such a plea, it would have undoubtedly drawn an objection that the indictment was duplicitous. Regardless of how the case was pleaded, the jury instructions required the jury to make unanimous findings as to each substance.

The indictment and the instructions of law given to the jury were proper and the evidence supports the jury's finding that but for Washington's distribution to Justin Knox of both Fentanyl and Oxycodone each independently of the other, Knox would not have died.

In addition to arguing that the verdicts represent impermissible mutually exclusive findings by the jury, Washington also argues that the evidence presented was insufficient as to Count II because the evidence showed that Washington distributed Percocet (a combination of Oxycodone and acetaminophen) to Justin Knox and that no acetaminophen was found in Knox's system.

Appellate Case: 08-3678     Page: 52     Date Filed: 06/26/2009 Entry ID: 3561263

Again, Washington's insufficiency claim is without merit. The evidence demonstrated that Washington distributed Fentanyl patches and Percocets to John Lochirco and Justin Knox on March 10, 2006. TT Vol. I, 154-155.

The testimony presented by Dr. Zaricor indicated that the toxicology report did not show the presence of acetaminophen and that if it was present it was in low enough levels that it would not be significant. TT Vol. II, 210. Dr. Zaricor further testified that acetaminophen is metabolized by the body quicker than Oxycodone. TT Vol. II, 217. Additionally, Dr. Zaricor stated it is possible that if an individual ingests Percocet and dies after taking it, that only Oxycodone would be found in the body fluids because where there is only a small dose of acetaminophen, it can be metabolized more quickly and not show up in the toxicology screening. TT Vol. II, 217. In the instant case, because there was little of the Oxycodone left in the blood, it would make sense that if Percocet had been ingested, the acetaminophen could have already metabolized and would not show up on the toxicology report. TT Vol. II, 217.

Dr. Christopher Long, the toxicologist, testified that he did not test Knox's urine for acetaminophen, only his blood. TT Vol. II, 230. Dr. Long stated that acetaminophen metabolizes about twice as fast as Oxycodone. TT Vol. II, 230. Additionally, Dr. Long explained that it is possible based on the data in the

42

toxicology report that Knox ingested Percocet even absent any finding of acetaminophen in the blood because during the "downward spiral" leading to death, the acetaminophen could have been eliminated leaving Oxycodone only remaining. TT Vol. II, 230.

The aforementioned evidence demonstrates that Lochirco and Knox purchased Fentanyl patches and Percocets from Washington, ingested them and that Justin Knox died as a result of the ingestion of those substances. The purchase of Percocets coupled with the finding of Oxycodone in Knox's system is sufficient to support the guilty verdict on Count II.

"The jury is responsible for assessing the credibility of witnesses and resolving conflicts in testimony, and its conclusions on these issues are 'virtually unreviewable on appeal.'" *United States v. Thompson*, 560 F.3d 745, 748-49, *quoting United States v. Morris*, 327 F.3d 760, 761 (8th Cir. 2003). The jury obviously credited the testimony of John Lochirco, Dr. Michael Zaricor and Dr. Christopher Long when it found that Washington distributed Oxycodone and that the distribution of the Oxycodone by Washington resulted in the death of Justin Knox. *See United States v. Brown*, 422 F. 3d 689, 692 (8th Cir. 2005) ("We have long held that the jury is the ultimate arbiter of a witness's credibility, and thus we will not disturb the jury's findings on appeal.")

43

In light of the foregoing, it cannot be said that no reasonable jury could have found Washington guilty beyond a reasonable doubt on Counts I and II.

## III. THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR IN ADMITTING THE TESTIMONY OF JOHN LOCHIRCO, LACY COLE AND HEATHER DEERING REGARDING PAST DRUG TRANSACTIONS WITH WASHINGTON WHERE THE EVIDENCE WAS INTRINSIC TO THE CRIMES CHARGED, ACTUAL NOTICE WAS AFFORDED AND THE EVIDENCE DEMONSTRATED WASHINGTON'S KNOWLEDGE, INTENT, LACK OF MISTAKE, PREPARATION AND PLAN

Washington next contends that the district court erred in allowing certain Government witnesses to testify about drug sales Washington made prior to the dates charged in the indictment. For the reasons stated below, this evidence is not properly classified under Federal Rule of Evidence 404(b) because it is intrinsic to the crimes charged in that it provides the context in which the charged crimes were committed and is directly connected to the factual circumstances of the crimes.

### Standard of Review

Washington argues that the correct standard of review is for abuse of discretion because Attorney Jenkins adequately preserved the issue by filing a "Notice with the Court Regarding 404(b)." Appellant's Brief, 57. The notice filed by Attorney Jenkins does not constitute an objection to the evidence at trial.

Because the defense had notice of at least two of the witnesses' testimony about which it now complains prior to the filing of that notice, it is likely that

44

Attorney Jenkins also believed the evidence to be intrinsic to the crimes charged. The defense had actual notice to all three witnesses' testimony and did not pursue a motion in limine to exclude their testimony, nor was there an objection to any of the testimony raised at trial.

Because no objection to the testimony was raised and no limiting instruction was requested, the defense did not give the district court an opportunity to make a ruling or give any necessary limiting instruction, and therefore failed to preserve this claimed error. *See* Federal Rule of Criminal Procedure 51(b). Because Washington failed to object to any of the testimony about which he now complains, this Court reviews admission of the evidence for plain error. *United States v. Maggard*, 156 F.3d 843, 849 (8th Cir. 1998); *United States v. Millard*, 139 F.3d 1200, 1203 (8th Cir. 1998).

"Under the plain error standard, this Court lacks authority to consider questions not first raised in the district court 'unless (1) the district court committed an error, i.e., deviated from a legal rule, (2) the error is plain, i.e. clear under current law, and (3) the error affected [the defendant's] substantial rights.'" *United States v. Green*, 151 F.3d 1111, 1114 (8th Cir. 1998), *quoting United States v. Montanye*, 996 F.2d 190, 192 (8th Cir. 1993) (en banc). Even if the error alleged satisfies this three-part test, the court of appeals will only exercise its discretion to

Appellate Case: 08-3678    Page: 56    Date Filed: 06/26/2009 Entry ID: 3561263

order correction in the event the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.*; *see also United States v. Atkinson*, 297 U.S. 157, 160 (1936).

*Analysis*

Rule 404(b) governs the admission of extrinsic evidence of wrongful conduct other than the conduct at issue, not intrinsic evidence. *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006); *United States v. Swinton*, 75 F.3d 374, 377 (8th Cir. 1996). While the strictures of Rule 404(b) govern extrinsic evidence, courts have recognized an exception to the general prohibition of the rule. *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984). In *Moore*, the court stated, "[a] jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void - without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *Id.* This evidence is admissible because it "completes the story" or provides a "total picture" of the charged crime. *Johnson*, 463 F.3d at 808. Moreover, Rule 404(b) does not serve to exclude evidence that explains the relationship of the parties. *United States v. Aldridge*, 561 F.3d 759, 765 (8th Cir. 2009) (finding of evidence of an illicit affair between the defendant and his secretary was not governed by Rule 404(b) because it showed why she perjured herself before the grand jury and

46

how she knew the inner workings of the company at issue).

This type of evidence is "inextricably intertwined" with the charged crimes. *See United States v. Adams*, 401 F.3d 886, 899 (8th Cir. 2005). This is so because it is "res gestae" or "intrinsic" evidence. *Id.* The court in *United States v. Bass*, 794 F.2d 1305 (8th Cir. 1986) also addressed this issue:

> We have held that where evidence of other crimes is "so blended or connected, with the one[s] on trial as that proof of one incidentally involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged," it is admissible as an integral part of the immediate context of the crime charged.

*Id.* at 1312, *quoting United States v. Derring*, 592 F.2d 1003, 1007 (8th Cir. 1979). This type of evidence is precisely what was admitted at trial in this case.

In some circumstances, it is difficult to differentiate between "the crime charged and other wrongful circumstances." *Adams*, 401 F.3d at 899. In that instance, the "intrinsic-extrinsic dichotomy blurs and loses legal significance." *Id.*

Washington was charged with distributing Fentanyl and Oxycodone on March 10, 2006 (Counts I and II) as well as distribution of Fentanyl to Heather Deering on March 16, 2006 (Count III) and possession with intent to distribute Fentanyl on April 19, 2006 (Count IV). Washington denied all of these distributions. The thrust of his cross-examination questions demonstrated that his defense was that he was in legitimate possession of Fentanyl and Oxycodone

Appellate Case: 08-3678    Page: 58    Date Filed: 06/26/2009 Entry ID: 3561263

because it had been prescribed to him by Dr. Robert Wudel and he did not distribute these drugs to anyone.

The testimony about which Washington now complains was intrinsic information showing that Washington was a drug supplier to the individuals involved and that he in fact distributed to Lochirco, Knox and Deering as the indictment alleges in Counts I-III. Lochirco testified that Deering introduced him to Washington so that Lochirco could obtain drugs from him. TT Vol. I, 146. He further stated that he and Knox had purchased Fentanyl and Percocets from Washington on multiple occasions prior to the night Knox died. TT Vol. I, 147-48.

Lochirco discussed the fact that Washington carried the drugs in a black bag during these transactions and removed the packaging from the Fentanyl patches so no information could be traced. TT Vol. I, 159-60. When Washington was arrested on April 19, 2006, he was in possession of a black bag consistent with the one Lochirco described and a Fentanyl patch was unwrapped. TT Vol. III, 445-47.

Lochirco also testified that when making arrangements for a purchase from Washington, he would call him on his cellular telephone. TT Vol. I, 150. The telephone records were later admitted for purposes of showing these prior contacts as well as the contact on the night Justin Knox died, TT Vol. III, 500-09, which

48

evidence was certainly admissible to show that Washington and Lochirco had a relationship and that it was Washington he called to obtain drugs from on March 10, 2006.

The testimony of Lochirco about which defendant complains goes to complete the story and provide the jury with the necessary background information to understand the relationship between Lochirco and Washington. If he had not purchased drugs from Washington in the past how would the purchase on March 10, 2006 have come to fruition? This evidence was intrinsic to the crime charged. It helped prove essential elements not only of Counts I and II, but also Count IV during which Washington possessed the same black bag and had unwrapped Fentanyl patches ready for a sale to Deering.

Just as Lochirco's testimony was intrinsic to the crimes charged, so was the testimony of Lacy Cole and Heather Deering. Cole testified that she and Deering had purchased Fentanyl patches and Percocets from Washington repeatedly. TT Vol. II, 238-39. She also testified about Washington removing any bar code information from the patches prior to distributing them. TT Vol. II, 241. Cole also knew that Deering had called Washington after Lochirco and Knox expressed curiosity about getting Fentanyl patches. TT Vol. II, 243.

Washington argues that Cole testified that the Government "elicited

49

testimony that Mr. Washington sold drugs in exchange for sex." Appellant's Brief, 59. That is not the case. When asked if there was ever a time when she had sex with Washington in exchange for pills and patches, Cole testified, "[n]ot really for exchange, but we did have sexual relationships also." TT Vol. II, 241.

Cole's testimony went to essential elements of the case and provided evidence that Lochirco and Knox were attempting to get drugs from Washington. Also, the fact that she knew Deering obtained drugs from Washington was intrinsic to the evidence presented on Counts III and IV. Moreover, without talking about her drug relationship with Washington, there would be no context whatsoever for how Cole knew Washington. Accordingly, this evidence was intrinsic.

Finally, Washington objects to Deering's testimony on the same grounds. Deering stated that she met Washington in November 2005, TT Vol. II, 349, and began purchasing Fentanyl patches and Percocet from him two to three times a week just after giving birth to her son. TT Vol. II, 350-51. During these transactions, Deering stated that Washington carried the drugs in a black fanny pack, TT Vol. II, 390, and always removed the manufacturer's labels from the Fentanyl patches. TT Vol. 352. Deering further testified that she introduced Lochirco and Knox to Washington so that they could purchase Fentanyl patches and Percocets from him. TT Vol. II, 354. After Knox's death, Deering agreed to

50

make a controlled purchase from Washington, but owed him $25 from a previous purchase and did not believe Washington would sell to her unless she cleared the debt. TT vol. II, 357. She did, in fact, make a controlled purchase from Washington which constituted Count III of the indictment. TT Vol. II, 357-370.

All of the testimony of Deering is intrinsic to the charged acts. Her past purchases from Washington explain why she owed him a debt and how she was able to make a controlled purchase from him. Additionally, this information is necessary background information for the jury to understand how the events in the case unfolded. The fact that Deering introduced Lochirco and Knox to Washington so that they could purchase narcotics from him goes to whether or not Washington distributed to Lochirco and Knox on the night that Knox died. This evidence is blended and connected with the charged conduct, and it proves elements of all of the crimes charged. Testimony regarding previous transactions between Deering and Washington provide a total picture and a context for their relationship. *See United States v. Severe*, 29 F.3d 444, 447 (8th Cir. 1994) ("Where the evidence of an act and the evidence of a crime charged are inextricably intertwined, the act is not extrinsic and Rule 404(b) is not implicated."); *see also United States v. Rolett*, 151 F.3d 787, 791 (8th Cir. 1998).

Despite the fact that the aforementioned testimony is not extrinsic to the

51

charged crimes, even under a Rule 404(b) analysis, it was admissible. Washington complains that no notice was provided and therefore the evidence was not properly admissible under Rule 404(b). With respect to the notice requirement, "The policy behind 404(b) is 'to reduce surprise and promote early resolution on the issue of admissibility.'" *United States v. Perez-Tosta*, 36 F.3d 1552, 1561 (8th Cir. 1994), *quoting* Fed.R.Evid. 404(b) Judiciary Committee note. There are no specific time limits beyond reasonable pretrial notice and the Committee notes go on to explain that "what constitutes a reasonable ... disclosure will depend largely on the circumstances of each case." *Id.*

The Government did not file a notice with the district court about this evidence because it believed this testimony was intrinsic to the case and therefore no notice was required. Despite no formal written notice being provided, the Government did provide actual notice of this evidence well in advance of trial. In its initial discovery production on January 18, 2008, the Government provided the deposition transcripts of the testimony of Heather Deering and John Lochirco which included testimony regarding the past drug transactions as well as a videotaped statement made by John Lochirco. *See* Acknowledgment of Receipt of Discovery signed by Attorney Janis C. Good, Addendum, 5-6. A summary report of Lacy Cole's testimony was provided to Attorney Jenkins on June 11, 2006.

Appellate Case: 08-3678    Page: 63    Date Filed: 06/26/2009 Entry ID: 3561263

Attorney Jenkins acknowledged receipt of this transcript on the record:

> I was given on Wednesday, which is before Friday when it's normal,
> and it's before the witness testifies, which is what the Government has
> to do, I was given the transcript, the Jencks material on a witness by
> the name of Lacy Cole, who is going to be a very devastating witness,
> and I gave my client, Mr. Washington, a copy of that that        day,
> so he had it and I had it well before we were entitled to have it.

TT Vol. I, 71.

There is no dispute that actual notice was provided well in advance of trial of this evidence. Furthermore, Attorney Jenkins was in a position to identify any of that evidence as extrinsic and file a motion to exclude it, because he had notice of at least the testimony of John Lochirco and Heather Deering when he filed a notice with the court of no Rule 404(b) evidence on June 9, 2008. *See* Docket Entry #42. This is further evidence of the position taken by the Government, and presumably defense counsel, that the evidence was intrinsic to the case.

This Court has consistently and repeatedly held that Rule 404(b) is a rule of inclusion, rather than exclusion. *United States v. Johnson*, 439 F.3d 884, 887 (8th Cir. 2006). Additionally, the trial court has broad discretion in determining whether to admit such evidence. *United States v. Katz*, 445 F.3d 1023, 1029 (8th Cir. 2006).

In order to be admissible under Rule 404(b), the evidence of the prior wrong must be: (1) relevant to a material issue raised at trial, (2) similar in kind and close

53

in time to the crime charged, (3) supported by sufficient evidence to support a finding by a jury that the defendant committed the other act, and (4) not the case of the prejudice that substantially outweighs its probative value. *United States v. Johnson*, 439 F.3d 947, 952 (8th Cir. 2006).

Here, the testimony of Lochirco, Deering and Cole was relevant to material issues raised at trial, namely, the fact that defendant distributed the drugs as alleged in the indictment, his intent and knowledge, absence of mistake or accident, plan and preparation. Washington's not guilty plea to all counts and the crux of his cross-examination questions demonstrated that his knowledge and intent were clearly at issue. The evidence presented was also clearly similar in kind and close in time to the crimes charged. The prior distributions referred to by the witnesses occurred between November 2005 and March 2006. Further, they mirrored the transactions charged in the indictment. These prior distributions were also supported by sufficient evidence to support a finding that Washington committed them. The testimony of the three witnesses was all similar and described the prior distributions similarly. By its verdicts, the jury obviously found these witnesses to be credible. Finally, the prejudicial effect of the evidence did not substantially outweigh its probative value. Additional transactions are no more prejudicial than the several charged transactions.

Appellate Case: 08-3678    Page: 65    Date Filed: 06/26/2009 Entry ID: 3561263

Accordingly, even when examined under the requirements of Rule 404(b), the evidence was clearly admissible. Because no objection was levied by the defense at trial to the admission of the evidence, this Court reviews its admission for plain error. This requires a finding that the district court erred which is plain under current law and that the error affected defendant's substantial rights. *Green*, 151 F.3d at 1114. Washington has in no way demonstrated that his substantial rights were affected. Additionally, even if he had made such a showing, this Court will only correct the error upon a finding that it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id., quoting United States v. Olano*, 507 U.S. 725, 732 (1993). The party asserting plain error bears this burden. *United States v. Campa-Fabela*, 210 F.3d 837, 840 (8th Cir. 2000). In light of the foregoing analysis of the evidence, Washington has wholly failed to meet this burden and no finding of a serious effect on the judicial proceedings can be supported.

Appellate Case: 08-3678    Page: 66    Date Filed: 06/26/2009 Entry ID: 3561263

The actual notice and the clear probative value of the evidence which greatly outweighed any prejudice supports the admission of the evidence. Even if the Court concluded that the defense's "Notice of No Rule 404(b)" evidence somehow preserved the error, nothing in the record supports a finding that the trial court abused its discretion in admitting the evidence. *See United States v. Steele*, 550 F.3d 693, 702 (8th Cir. 2008). Because the trial court has broad discretion to admit evidence of other crimes or bad acts under Rule 404(b), its decision to do so should be overturned only when it is clear that the evidence has no bearing on the case. *Campa-Fabela*, 210 F.3d at 840; *see also Aldridge*, 561 F.3d at 765-66.

## IV.  THE DISTRICT COURT PROPERLY GAVE JURY INSTRUCTIONS 17 AND 18 AS THEY ARE ACCURATE STATEMENTS OF THE LAW AND PROPERLY REFLECT THE CHARGES AND THE EVIDENCE PRESENTED

Finally, Washington complains that the district court committed plain error by giving jury instructions 17 and 18 because they are improper statements of the law and they support legally and logically inconsistent findings. Appellant's Brief, 62.

### *Standard of Review*

Because Washington failed to object to the use of the instructions at trial, this Court reviews for plain error. *See* Fed. R. Crim. Proc. 52(b); *United States v. Harris*, 324 F.3d 602, 607 (8th Cir. 2003).

56

### *Analysis*

The instructions at issue read as follows:

Instruction No. 17

The Government need not prove that the defendant knew his distribution of Fentanyl could result in the death of another. The Government need not prove the defendant intended to cause death, knowingly risked death or that death was reasonably foreseeable. Additionally, the Government need not prove that the defendant distributed the Fentanyl to Justin Knox.

All the Government must prove beyond a reasonable doubt is that the defendant intentionally distributed the Fentanyl and that but for Justin Knox's use of the Fentanyl that defendant distributed, Justin Knox would not have died.

Instruction No. 18

The Government need not prove that the defendant knew his distribution of Oxycodone could result in the death of another. The Government need not prove the defendant intended to cause death, knowingly risked death or that death was reasonably foreseeable. Additionally, the Government need not prove that the defendant distributed Oxycodone to Justin Knox.

All that the Government must prove beyond a reasonable doubt is that the defendant intentionally distributed Oxycodone and that but for Justin Knox's use of the Oxycodone that defendant distributed, Justin Knox would not have died.

Courts that have addressed this issue have unanimously upheld this

statement of the law and the constitutionality of this provision of the section

despite no mens rea component as to the resulting death.

57

In *United States v. McIntosh*, 236 F.3d 968 (8th Cir. 2001), the Eighth

Circuit Court of Appeals interpreted the same language for drug distributions

which was at issue in the instant case, namely "if death or serious bodily injury

results from the use of such substance." The *McIntosh* court held:

> We hold this language is unambiguous and that giving effect to its plain
> meaning prohibits us from superimposing upon the statute a foreseeability or
> proximate cause requirement. From the statute's clear language, it is clear
> Congress intended to expose a defendant to a more severe minimum
> sentence *whenever* death or serious injury is a consequence of the victim's
> use of a controlled substance that has been manufactured or distributed by
> that defendant.

*McIntosh*, 236 F.3d at 972. The *McIntosh* court also cited the Third Circuit Court

of Appeals decision in *United States v. Robinson*, 167 F.3d 824, 831 (3d Cir. 1999)

("Congress recognized that the risk is inherent in the product and thus it provided

that persons who distribute it do so at their peril"). The Eighth Circuit has also

recognized the Sixth Circuit Court of Appeals conclusion that, with respect to the

issue of death resulting, the statute is in effect a strict liability statute. *See United

States v. Rebmann*, 226 F.3d 521, 525 (6th Cir. 2000) (holding that it is within

Congress' power to create a strict liability crime in some situations).

58

In *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994), the Fourth Circuit Court of Appeals held that the statute "puts drug dealers and users on clear notice that their sentences will be enhanced if people die from using the drugs they distribute" and that "[w]here serious bodily injury or death results from the distribution of certain drugs, Congress has elected to enhance a defendant's sentence regardless of whether defendant knew or should have known that death would result."

The First Circuit Court of Appeals examined the issue of whether or not 21 U.S.C. § 841(b)(1)(C) requires proof that the death was reasonably foreseeable to the defendant in *United States v. Soler*, 275 F.3d 146, 152 (1st Cir. 2002). There, the court found that:

> Congress knows how to write statutes containing state-of-mind-requirements and Congress demonstrated that facility in crafting this very statute. *E.g.*, *id.* § 841(a) (prohibiting knowing and intentional drug trafficking). This makes the omission of an explicit intent requirement in section 841(b)(1)(C) telling.

In support of his argument that the instant statute is not a strict liability statute, Washington cites *United States v. Houston*, 406 F.3d 1121 (9th Cir. 2005). While the *Houston* court did hypothesize that there could be some fact scenarios in which the distribution of a controlled substance is so attenuated from the resulting death that criminal liability could not be imposed within the bounds of due process, the

59

*Houston* court did find that there is no proximate cause requirement in the statute:

> Requiring that the death have been foreseeable before imposing the enhancement described in § 841(b)(1)(C) is inconsistent with the plain language of the statute and with our circuit's prior treatment of § 841(b)(1). We therefore join our sister circuits in holding that proximate cause is not a required element for conviction and sentencing under § 841(b)(1)(C). All that is necessary under the statutory language is that "death...results" from the offense described in § 841(a)(1). § 841(b)(1)(C). Cause-in-fact is required by the "results" language, but proximate cause, at least insofar as it requires that the death have been foreseeable, is not a required element.

*Houston*, 406 F.3d at 1124-25.

It is clear that the Eighth Circuit Court of Appeals has adopted the position in line with the majority of circuit courts and has uniformly rejected reading any type of mens rea requirement into the statute which is wholly unsupported by its plain language. Accordingly, Instruction Nos. 17 and 18 are correct statements of the law and can in no way be found to constitute plain error.

60

## **CONCLUSION**

For all the foregoing reasons, this Court should affirm the conviction and

sentence.

Respectfully submitted,

MICHAEL W. REAP
Acting United States Attorney

_____
TIFFANY G. BECKER, #77631
Assistant United States Attorney
111 S. 10th Street, 20th Floor
St. Louis, Missouri 63102
(314) 539-7653

Counsel for Appellee
United States of America

June _____, 2009.

61

# CERTIFICATE OF COMPLIANCE

COMES NOW counsel for Appellee and certifies the following:

1.     The Brief of Appellee complies with the word limitations set forth within Fed.R.App.P. 32(a)(7)(A), (B) and (C).  The undersigned hereby certifies pursuant to Rule 32(a)(C)(7) that this Brief is in monospaced type and contains 13,874 words.

2.     Pursuant to Eighth Circuit Rule 28A(c) that this Brief was prepared using Corel WordPerfect 12 software.

3.     The attached computer diskette contains the full text of the Brief of Appellee.  This disk has been scanned for viruses and was found to be virus free. In addition, a computer diskette containing the Brief of Appellee has been served on the Appellant's counsel of record.

_____
TIFFANY G. BECKER, #77631
Assistant United States Attorney

Appellate Case: 08-3678     Page: 73     Date Filed: 06/26/2009 Entry ID: 3561263

# ADDENDUM

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that two copies of the foregoing and one diskette that has been scanned for viruses and is virus free, were mailed postage prepaid United States Mail first class to:

Daniel Juengel
Attorney at Law

This _____ day of June, 2009.

_____
TIFFANY G. BECKER, #77631